SHORES, Justice.
The plaintiffs, Martin A. Pomerantz, Sr., and Quad Cities Nissan, Inc. (“Quad Cities”), petition the Court for a writ of mandamus to the Honorable Inge Johnson, judge of the Circuit Court of Colbert County, Alabama, directing Judge Johnson to vacate her ruling of August 20,1991, which denied the plaintiffs’ request for subpoenas and granted the defendants’ request for a protective order against discovery. We grant the writ.
We adopt the facts that are set forth in Pomerantz v. Green, 584 So.2d 826 (Ala.1991), where Judge Johnson granted the defendants’ motion for summary judgment and this Court reversed and remanded. In that opinion we stated:
“Pomerantz and Quad Cities Nissan, Inc. (“Quad Cities”), filed an action against G. Olen Green and Shoals Nissan, Inc., predecessor to G. Group, Inc., alleging fraud and misrepresentation....
“Pomerantz is the majority shareholder in Quad Cities; Green is the majority shareholder in G. Group, Inc., which contains the assets of Shoals Nissan except for those assets sold by Shoals Nissan to Pomerantz and Quad Cities. In May 1989, Pomerantz and his son Martin Pomerantz, Jr., negotiated with Green to purchase Shoals Nissan’s automobile business_ During the course of negotiations for the purchase, Green provided Pomerantz with a financial statement concerning Shoals Nissan’s automobile business. Quad Cities alleges that Green fraudulently misrepresented the profitability of that automobile business in that financial statement.
[[Image here]]
“The evidence indicates that during the negotiations Pomerantz and Pomerantz, Jr., both insisted that Green provide them with a financial statement and that they told Green that they would not buy the business if they did not receive one. The financial statement that Green gave the Pomerantzes was partially handwritten and it purported to represent the operations of the automobile business from January 1, 1989, through April 30, 1989. Concerning that financial statement, Pomerantz, Jr., in deposition, testified in response to questions by Green as follows:
“ ‘Q. Well, didn’t he tell you, “I’ll give you one, but you can’t go by all these figures. What I go by is the bottom line”?
“ ‘A. No, because I would have walked out on the deal at that point in time.
“ ‘Q. You’d have just got up and left? Is that what you’re saying?
“ ‘A. Absolutely.
“ ‘Q. All right. Now—
“ ‘A. What he did tell me was, the profit is not necessarily reflected on the bottom line because they were getting perks out in other ways, so that in actuality the dealership should have been making more money than it showed.
[[Image here]]
“ 'Q. So what he told you was that this financial statement did not accurately reflect what they did out there? Didn’t he tell you that?
“‘A. Right. He said it did not accurately reflect the real profit of the dealership, that it was greater.
“ ‘Q. And did he also tell you that it did not accurately reflect the real sales figures of the corporation?
“‘A. No.
“ ‘Q. He didn’t tell you that?
“‘A. No.
*905 “ ‘Q. Did he tell you that it didn’t accurately reflect the real parts and services and so forth that was done?
“ ‘A. Absolutely not.”
“The evidence further indicates that after receiving the financial statement, Pomerantz, Pomerantz, Jr., and an associate of theirs who had years of experience in the automobile business took the figures for both the sales of parts and the servicing of automobiles and performed a complicated series of calculations to determine whether the automobile business would be profitable; that during that analysis, Pomerantz and Pomerantz, Jr., contacted Green with questions about items on the financial statement....
“Quad Cities and Pomerantz bought the automobile business for $1,300,000. The record indicates that some months after the sale, Pomerantz acquired a copy of a confidential operating analysis (“COA”) of the automobile business from a Nissan representative. The COA is a compilation of operations information that every Nissan dealer transmits monthly by computer to Nissan Corporation of America. The COA in this case addressed the four-month period from January 1, 1989, through April 30, 1989, and showed the income of the automobile business from the sales of parts and accessories and the income generated by the service department. The COA, for the same four-month period covered by the financial statement given by Green to Quad Cities and Pomerantz, reflected $68,964 less income for the parts department than the financial statement showed (a 31% difference), and $55,692 less income for the service department (a 47% difference).
“Pomerantz, Jr., testified that Nissan would not provide those records before the sale, that Nissan would not give any information to a prospective buyer of the automobile business until Nissan itself had approved the buyer, and that Nissan would literally not have ‘even a conversation with us until they [had] a buy-sell agreement and a letter of intent from Mr. Green saying that [he was] going to sell to us.’
"Green testified that he had his bookkeeper send in a monthly report to Nissan by computer and that he used the form of that report to maintain his own separate records of the automobile business. He said, ‘I didn’t report everything to Nissan. I reported what I wanted Nissan to have’; he also said that ‘most’ of the information he reported monthly to Nissan was not accurate and that he made inaccurate reports because he did not ‘trust the new regime at Nissan.’ ”
584 So.2d at 826-28.
After this Court reversed the summary judgment in favor of the defendants and remanded the case for further proceedings, the plaintiffs requested, by subpoenas, financial statements or records from the following nonparties: Nissan Motor Corporation, U.S.A., the distributor of Nissan automobile to the Shoals Nissan dealership; Holland’s Tax Service, Green’s accounting firm; Bank Independent; Central Bank; and First National Bank of Florence. The defendants filed an objection to the plaintiffs’ subpoenas, and the court held a hearing on August 20, 1991. The trial judge quashed the subpoenas and stated that the plaintiffs should have requested the documents when they purchased the business. The plaintiffs contend that all of the records they have requested were compiled by Green or were based on information supplied to the non-parties by Green or his agents, and that these documents reflect the dealership’s actual income and show a pattern or scheme of fraud on the part of the defendants. In addition, they argue that Green’s concession during his deposition that the financial information in some of the records had been falsified demonstrates that Green had a practice of intentionally submitting falsified financial records. The plaintiffs claim that because of these facts, they should be allowed discovery of the requested documents so that they can prove a fraudulent scheme on the part of the defendants.
Rule 26(b)(1), A.R.Civ.P., provides:
*906 “Parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action, whether it relates to the claim or defense of the party seeking discovery or to the claim or defense of any other party, including the existence, description, nature, custody, condition and location of any books, documents, or other tangible things and the identity and location of persons having knowledge of any discoverable matter. It is not grounds for objection that the information sought will be inadmissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence.”
Discovery is permitted if there is “any likelihood that the information sought will aid the party seeking discovery in the pursuit of his claim.” Ex parte AMI West Alabama General Hosp., 582 So.2d 484, 485 (Ala.1991).
The defendants, as respondents here, argue that the trial court is vested with broad discretion in ruling on discovery matters and that an appellate court should not reverse the trial court’s ruling unless under all the circumstances it appears that there has been a clear abuse of discretion. Although we recognize this principle of law, this Court has held that a trial judge should “incline toward permitting the broadest discovery and utilize his discretion to issue protective orders to protect the interests of parties opposing discovery.” Ex parte AMI West Alabama General Hosp., 582 So.2d 484 at 486.
This Court has noted that a writ of mandamus has been issued “more often in instances where the trial court has restricted or prohibited discovery than in instances where liberal discovery has been allowed.” Id. This Court has held that the liberal scope of discovery is even broader in cases involving fraud allegations; the rationale is that the burden of proof for plaintiffs is greater in fraud cases and therefore they are entitled to a broader range of discovery in those cases. Ex parte Clarke, 582 So.2d 1064, 1067-68 (Ala.1991).
The plaintiffs' discovery request should not have been denied. A review of the evidence reveals that the trial judge unduly limited the discovery of needed information and thereby abused her discretion.
For the foregoing reasons, this petition for the writ of mandamus is granted.
WRIT GRANTED.
HORNSBY, C.J., and MADDOX, and HOUSTON, JJ., concur.
KENNEDY, J., concurs in the result.